IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2018 Session

**EDGAR RAY BETTIS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2014-CR-523    Larry J. Wallace, Judge**

_____

**No. M2017-01845-CCA-R3-PC**

_____

A jury convicted the Petitioner, Edgar Ray Bettis, of first degree murder, second degree murder, and unauthorized use of a vehicle, and he received an effective life sentence. After his convictions and sentences were affirmed on appeal, the Petitioner sought post-conviction relief on the grounds that trial counsel was ineffective in: (1) failing to evaluate the Petitioner's competency; (2) failing to file a motion to suppress the Petitioner's statement; (3) allowing a substitute medical examiner to testify; (4) failing to object to photographs entered into evidence; and (5) failing to secure a forensic pathologist to counter the State's expert. After a thorough review of the record and law, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

William Walker Wade, Nashville, Tennessee, for the appellant, Edgar Ray Bettis.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Ray Crouch, District Attorney General; and Billy H. Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

### I. Trial

On April 1, 2011, the Petitioner strangled the victim, who was the manager of the trailer park where he lived, after striking her repeatedly with an ashtray. He was charged with premeditated first degree murder, felony murder, and theft of the victim's automobile. The Petitioner argued that the homicide occurred in self-defense after the elderly victim became confused about his identity and attacked him with a pencil. He also asserted that he took her vehicle in a panic after the crime.

The proof at trial established the Petitioner lived at the trailer park with three of his brothers: Mr. Ronald Pugh,[1] who was the maintenance manager, Mr. Delbert Bettis, with whom the Petitioner shared a trailer, and Mr. Edward Maples, who was temporarily living in the Petitioner's trailer, hiding from law enforcement because he had violated parole in California. Mr. Delbert Bettis intended to move out of town, and the Petitioner and Mr. Pugh went to Wal-Mart on the day of the victim's death to purchase luggage so that the Petitioner would also be prepared to move. However, the Petitioner intended to try to negotiate with the victim to let him remain in the trailer, even though he only had money for half of the rent. The Petitioner went to the victim's home in the late afternoon of April 1, 2011.

According to a statement that the Petitioner gave to police, the Petitioner asked the victim about staying in the trailer after Mr. Delbert Bettis's departure, but she became angry and confused. She spoke about the prior tenant of his trailer, who had left significant debt, and then began to attack the Petitioner. The Petitioner acknowledged hitting the victim repeatedly with an ashtray, "tasing" her, and ultimately choking her. The Petitioner, who weighed over 215 pounds, told police that the 108-pound victim attacked him with a pencil and that the altercation lasted approximately twenty minutes. He was aware that the victim had a gun in her home. According to the Petitioner, he attempted to stop the victim from attacking him several times, but she "kept coming at" him. The Petitioner stated that after the victim's death, he took her car, went to a motel, and spent the night there. The next morning, he left the victim's car with the keys locked inside at a gas station and paid a taxi to take him to Nashville, where he boarded a bus for Shreveport. He was arrested in Jackson, Mississippi, when the bus made a scheduled

---

[1] The transcript of the trial spells the last name of the Petitioner's brother as "Pew." We use the spelling as it appears in the indictment, showing the Petitioner's alias as "Edgar R. Pugh."

stop. Agent Joe Craig of the Tennessee Bureau of Investigation and Brian Johnson, Chief of Police in Burns, Tennessee, travelled to Jackson, interviewed the Petitioner, and took the written statement in which he acknowledged that he killed the victim but asserted that it was in self-defense. Agent Craig testified that strangulation "is a method of death that takes a while."

At trial, the State presented strong physical evidence, in addition to the confession, linking the Petitioner to the crime. The victim's hair was found on a pair of pants in the Petitioner's bedroom. The victim's blood was on the sleeve of a shirt found in the same location. The Petitioner was recorded by video cameras at Wal-Mart around noon, purchasing the luggage, and at the motel, checking in around 9:00 p.m., and he was wearing the same pants and shirt which produced the blood and hair. A written receipt for $260, which matched the Petitioner's share of rent and utilities, was found at the victim's residence. Under the victim's arm was a broken pencil. Mr. Maples testified that the Petitioner returned to the trailer the evening of the victim's death and stated that he thought he had killed the victim and that she deserved what she got. Mr. Maples testified that the Petitioner packed numerous items, including the Taser, into a bag before he left. Video of the bus station in Nashville showed the Petitioner exiting the taxi with five or six bags, but only three bags were recovered when the Petitioner was arrested, and none contained the Taser. The Petitioner had no physical injuries from the altercation.

During trial counsel's opening statement, trial counsel asserted that there would be proof that the victim suffered from dementia and was sometimes confused about the identity of those around her. Trial counsel also stated, "The proof is going to be, and you'll hear, that my client has some of the same symptoms, that he has had open heart surgery." Trial counsel noted that the case involved "two older people … both suffering from some confusion." Numerous witnesses for the State, however, testified that the victim did not have any mental health problems or confusion. Mr. Pugh testified that after the death of the victim's husband, she would "just kind of space out" and appear confused about what was happening around her. He also testified that the Petitioner would "zone out." Mr. Maples testified that the Petitioner had "Alzheimer's real bad, just like our mother had." The trial court instructed the jury to disregard the testimony involving a medical diagnosis, and Mr. Maples then testified that the Petitioner had symptoms similar to his mother's. Mr. Delbert Bettis testified that the Petitioner would "zone out" but that he did not have trouble remembering names.

The Petitioner's trial counsel entered an agreed order allowing a substitute medical examiner, Dr. Adele Lewis, to testify for Dr. Thomas Deering, the examiner who had actually performed the autopsy. In a jury-out hearing, trial counsel objected to certain autopsy photographs showing the victim's broken and excised larynx. The trial court determined that a photograph would be admitted but would be reproduced in a black-and-

white rather than color format. Trial counsel also objected to any testimony from Dr. Lewis which would differ from the written autopsy report, and the trial court ruled that as long as Dr. Lewis "stay[ed] roughly close" to the report, her testimony would be admitted. This court summarized the testimony on direct appeal:

Adele Lewis, the Deputy Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that Dr. Thomas Deering performed the victim's autopsy, that Dr. Deering was unavailable to testify, that she had reviewed Dr. Deering's autopsy report, and that she agreed with Dr. Deering's findings. The victim was four feet, eleven inches tall and weighed one hundred eight pounds. She had multiple cuts on the top of her head that appeared to have been caused by her head being struck by a blunt object or her head striking a blunt object. She also had scrapes across her forehead and left eye, multiple abrasions on her left cheek, and bleeding deep under her scalp. The victim's head and face injuries were consistent with her having been hit with an ashtray. Bruises and scrapes on the backs of her hands could have been defensive wounds. The victim had an injury behind her left ear that was possibly a stab wound from a pencil. She also had an injury to the back of her left ear, and it was probably caused by an object or hand hitting her ear. The victim had a puncture wound on the tip of her chin and abrasions on her jaw that were caused by blunt force trauma such as a fist hitting her face. Dr. Lewis acknowledged that the wounds also could have been caused by the victim's own fingernails as she tried to get the [Petitioner's] hands off her neck. The victim did not have any skull fractures.

Dr. Lewis testified that the victim's injuries could have rendered her unconscious but that they were not fatal. She said that Dr. Deering "paid special close attention to the muscles and the soft tissues and the bones of the neck. Specifically, he did a very detailed dissection of these, looking for any injuries." Dr. Deering found a fracture in [the hardened cartilage] in the victim's larynx and bleeding around the [cartilage]. The State showed a black and white photograph of the victim's larynx to the jury, and Dr. Lewis said the photograph showed broken thyroid cartilage on the left side. Dr. Lewis explained that a significant amount of force must have been applied to the victim's neck and that such an injury was more frequently seen in strangulation by hand than strangulation by an object such as a rope. The victim also had bite hemorrhages on her tongue, suggesting that she bit her tongue during her struggle with the [Petitioner]. Dr. Deering's report stated that the victim's cause of death was "multiple modality trauma," which Dr. Lewis described as a "term that encompasses

- 4 -

the fact that this lady not only was ... beaten or struck with something, but also strangled. Another way to have put it would have been blunt force injuries to the head and strangulation." However, "[t]he actual terminal event was the strangulation." Dr. Lewis said that strangulation for at least thirty seconds caused unconsciousness and that strangulation for two to four minutes caused death.

On cross-examination, Dr. Lewis acknowledged that she did not know if the victim was attacking someone at the time of death and that the wounds on the back of the victim's hands could have been offensive wounds. She also acknowledged that an older person's larynx was easier to break than that of a younger person. The victim could have died from strangulation in one to two minutes.

*State v. Edgar Ray Bettis*, No. M2012-02158-CCA-R3-CD, 2013 WL 5436702, at *9-10 (Tenn. Crim. App. Sept. 27, 2013), *perm. app. denied* (Tenn. Jan. 16, 2014).

The jury convicted the Petitioner of first degree premeditated murder and of the lesser-included offenses of second degree murder and unauthorized use of a vehicle. The murder convictions were merged, and the Petitioner was sentenced to an effective life sentence. *Id.* at *10. On appeal, the Petitioner challenged the sufficiency of the evidence, the admission of Dr. Lewis's testimony regarding strangulation, and the admission of the photograph of the victim's larynx. *Id.* at *1. This court affirmed the convictions and sentences. *Id.* at *10-12.

## II. Post-Conviction

The Petitioner filed a timely petition for post-conviction relief and was granted a hearing. At the post-conviction hearing, Dr. Jon Garrison, a forensic evaluator and expert in psychology, testified regarding the Petitioner's competency. Dr. Garrison confirmed that the Petitioner was on medications for physical ailments. He evaluated the Petitioner and determined that the Petitioner was competent at the time of the post-conviction hearing. He agreed that elderly people such as the Petitioner might have difficulty participating in their own defense due to physical ailments. He could not determine if the Petitioner was competent at the time of trial, explaining that making a retroactive competency determination would not be ethical or possible because competency could vary over time.

The Petitioner testified that he suffered from high blood pressure and a heart condition and that he would experience dizziness and would "lose [his] thoughts" if he failed to take his medication. He "believe[d]" he told trial counsel about his symptoms

before trial. However, he did not recall discussing psychiatric issues, mental issues, memory loss, or disorientation with trial counsel. He testified that around 2011, he suffered from confusion and memory loss. Trial counsel never discussed evaluating the Petitioner's competency. The Petitioner was not on the same medication at the time he was arrested and at the time of the post-conviction hearing. He stated that he was currently worse than he was at the time of trial, but he ultimately clarified that he felt worse because his physical health had declined and not because his mental health had changed.

The Petitioner stated he had been awake for three or four days prior to his interview with Agent Craig in Jackson, Mississippi. He felt tired, "woozy," and "[j]ust out of it" during the interview. He was permitted to take his medication at the Mississippi jail. He did not recall telling Agent Craig that he was too tired to participate in the interview or "nodding off" during the interview. He did not ask Agent Craig to stop the interview.

The Petitioner testified that he recalled trial counsel informing him that he did not have to agree to Dr. Lewis substituting for Dr. Deering, but he did not understand that by entering the agreed order, he was waiving his right to challenge her testimony.

Trial counsel testified that he met with the Petitioner numerous times and that he and his office staff interviewed potential witnesses. Trial counsel did not have the Petitioner evaluated for competency because he saw no evidence of dementia or anything else that would cause him to question the Petitioner's competency. The Petitioner "was very helpful all the way through, and he clearly understood everything that was going on." Trial counsel investigated witnesses to try to elicit statements regarding the Petitioner's mental health. Trial counsel stated that he did not anticipate having evidence that the Petitioner was not competent, but that he referenced the Petitioner's mental health in his opening statement to emphasize to the jury that the Petitioner, like the victim, was elderly and might be less accountable for his actions. Trial counsel did not argue to the jury that the Petitioner was incompetent but only that his age-related physical and mental health issues would diminish his culpability. While Mr. Maples testified that the Petitioner had Alzheimer's disease, trial counsel described Mr. Maples's testimony in general as "delusional." For example, Mr. Maples testified that he was afraid he was being targeted by the mafia and that he had a card issued by the State of California which forbade his arrest by any law enforcement officer in any state. Furthermore, the trial court sustained an objection to Mr. Maples's testimony that the Petitioner suffered from Alzheimer's disease.

Trial counsel was not aware that the Petitioner had been awake for several days prior to giving the statement to Agent Craig. He did not file a motion to suppress because

he saw no basis to assert that the statement was obtained in violation of the Petitioner's rights.

Trial counsel testified that he made a strategic decision to agree to substitute Dr. Lewis's testimony because he thought it was likely she would be limited to the information in the autopsy report. This strategy did not work, because Dr. Lewis also testified regarding the time it would take to strangle the victim. Trial counsel objected to the testimony regarding the crushed larynx and strangulation, but the trial court allowed the evidence to be presented to the jury. Dr. Lewis acknowledged that the victim's wounds could have been offensive. Trial counsel agreed that Dr. Lewis's testimony would have been admitted whether or not he had entered into the agreed order.

Trial counsel did not object to the family photographs of the victim because he believed that they would be admitted over his objection and because there could be a tactical disadvantage to making the objection in front of the jury. He testified that while the autopsy photographs were graphic, they were not gory and that the jury had no reaction to them. He testified that he reviewed all the autopsy photographs and that their admissibility was determined in a jury-out hearing. Trial counsel objected to a photograph of the victim's excised larynx, and the trial court determined that the photograph would have to be reproduced in black and white instead of color. Trial counsel stated that he chose not to object to the crime scene photos because he felt that they supported the Petitioner's assertion that the victim attacked him with a pencil.

Trial counsel knew that funding was available for a forensic pathologist if he had chosen to hire one. He testified that he did not believe that a forensic pathologist was necessary because the Petitioner acknowledged having killed the victim by strangulation. Instead, the defense strategy was to assert that the Petitioner strangled the victim in self-defense after she had grown confused and attacked him. He did not think that another pathologist would have disagreed with Dr. Lewis regarding the cause of death but acknowledged that expert testimony that the victim's wounds were received during mutual combat would have been helpful.

Agent Craig testified that he did not record the interview with the Petitioner during which the Petitioner made a statement to law enforcement acknowledging that he killed the victim. Instead, Agent Craig conducted the interview, summarized the Petitioner's statements in written form, and allowed the Petitioner to review and sign the summary. Agent Craig acknowledged that he "probably" did not ask the Petitioner about taking medication. He was aware that the Petitioner would have been awake for the period of time between the homicide and his arrest. However, he stated he saw no cause for concern and that it was his policy to make an individual determination regarding whether to stop an interview based on the suspect's mental state. According to Agent Craig, the

interview lasted a little over an hour, and the Petitioner was "locked in," "focused," and able to answer questions. Agent Craig stated, "I don't recall anything that would lead me to believe that he was unable to follow through with [the interview]." The Petitioner reviewed the statement and made no substantive changes. Agent Craig stated that nothing during the interview, including the Petitioner's potential fatigue, raised any questions regarding his competency. The Petitioner told Agent Craig that there were no issues with his treatment at the jail. Agent Craig acknowledged that someone suffering from mental illness would not necessarily recognize it or be able to communicate it during an interview. He stated that in the past, he had "probably" chosen to continue some interviews where there were concerns of competency but had also forgone continuing others.

The post-conviction court denied relief, finding that the Petitioner had failed to establish deficiency or prejudice with regard to each claim. The post-conviction court made a finding that it credited the testimony of trial counsel and Agent Craig, that the evidence against the Petitioner was "overwhelming," and that the Petitioner had received effective assistance of counsel. The Petitioner appeals.

## ANALYSIS

The Petitioner argues that he received the ineffective assistance of counsel when trial counsel: (1) failed to have him evaluated for competency; (2) failed to move to suppress his statement; (3) agreed to substitute Dr. Lewis for the pathologist who had conducted the autopsy; (4) failed to object to photographs of the victim with her family, to autopsy photographs, and to photographs of the crime scene; and (5) failed to secure an expert witness to dispute Dr. Lewis's testimony. The State responds that trial counsel provided effective assistance.

Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witness, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed de novo. *Id.* Each element of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.*

- 8 -

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). In evaluating counsel's performance, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with the presumption "that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner must show that the deficiency deprived him of a fair trial and called the reliability of the outcome of the proceeding into question. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## I. Competency

The Petitioner asserts that the trial record, particularly the testimony of Mr. Maples, suggests that he had mental health issues and was not competent and that trial counsel was deficient in not having him evaluated for competency. The Petitioner acknowledges that there is no way to determine whether he was competent at the time of trial. The State argues that the Petitioner has not demonstrated that the failure to obtain an evaluation was deficient or prejudicial.

At the post-conviction hearing, the Petitioner questioned trial counsel about his opening statement, where trial counsel noted that the Petitioner had some of the "same symptoms" of dementia that the victim had. Trial counsel acknowledged that Mr. Maples testified that the Petitioner had "Alzheimer's real bad, just like our mother had" but noted that Mr. Maples was not a credible witness. The Petitioner's other brothers, Mr. Delbert Bettis and Mr. Pugh, testified that the Petitioner would "zone out," but they did not testify that he had any significant mental health problems. Mr. Delbert Bettis testified that the Petitioner did not have any trouble remembering names.

At the post-conviction hearing, both trial counsel and Agent Craig testified that the Petitioner did not appear to have any mental impairment, and the trial court credited their testimony. Trial counsel testified that the Petitioner was "helpful" during trial and that "he clearly understood everything that was going on." While trial counsel emphasized evidence regarding the Petitioner's age and mental or physical health in an effort to reduce culpability, he stated that he did not have any reason to doubt the Petitioner's competency. Furthermore, Dr. Garrison, who found the Petitioner competent at the time of the hearing, testified that he could make no retroactive determination of the Petitioner's competency at the time of trial. Because the post-conviction court credited trial counsel's testimony that he had no reason to doubt the Petitioner's competency, the Petitioner has not shown deficiency. Neither has he demonstrated that, but for the failure to have him evaluated, he would have been found incompetent and would not have had to stand trial.

## II. Motion to Suppress

The Petitioner asserts that trial counsel should have moved for the suppression of the Petitioner's statement on the basis that the statement was not recorded and that the Petitioner had been awake multiple days prior to giving the statement. He notes that he gained no tactical advantage by not filing a motion to suppress. He asserts that, without his confession, there is a reasonable probability that the trial would have had a different outcome.

Here, the post-conviction court credited trial counsel's testimony that the Petitioner did not inform him that the Petitioner had been awake for several days prior to making the statement. Accordingly, the Petitioner has not shown deficiency. To demonstrate prejudice, the petitioner must show a reasonable probability that the motion would have been granted and that the outcome of the proceeding would thereby have been altered. *See Jason Lee Holley v. State*, No. M2017-00510-CCA-R3-PC, 2017 WL 5197295, at \*5 (Tenn. Crim. App. Nov. 9, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018). At the post-conviction hearing, the Petitioner essentially testified that he was affected by sleep deprivation and that his statement was not voluntary. Agent Craig, on the other hand, testified that the Petitioner did not appear excessively sleepy and that he was "locked in," "focused," and able to answer questions. Agent Craig stated, "I don't recall anything that would lead me to believe that he was unable to follow through with [the interview]." The interview lasted a little over one hour. While lack of sleep may affect the voluntariness of a statement, *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013), the post-conviction court here credited the statements of Agent Craig over those of the Petitioner. Agent Craig testified that the Petitioner did not appear to be affected by lack of sleep. Although the Petitioner asserts that the interview was unreliable because it was not recorded, Agent Craig was not required to record the interview. *See State v. Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001). Accordingly, the Petitioner has not demonstrated a reasonable probability that the motion would have succeeded. Given the nature of the physical evidence implicating the Petitioner, neither has he shown a reasonable probability that the success of the motion would have changed the outcome of the trial. He is not entitled to relief.

### III. Substitute Medical Examiner

While acknowledging trial counsel's testimony that agreeing to the substitution of Dr. Lewis for Dr. Deering was strategic, the Petitioner asserts that the strategy was so misguided that it was not entitled to deference and that he was prejudiced because without the agreement, he would have been able to exclude any medical evidence. The State responds that trial counsel's strategic decision was entitled to deference and that the Petitioner has failed to show prejudice.

When asked about the agreed order, trial counsel stated that he preferred to have a substitute medical examiner testify because the substitute was generally limited to the contents of the written report. He also testified that he believed the substitution would have been permitted even without his agreement. Dr. Lewis testified that she agreed with Dr. Deering's conclusion that the victim died of "multiple modality" trauma, including blunt force injuries and strangulation, and she elaborated that the terminal event was strangulation, which would have taken one and one-half to four minutes. Trial

counsel testified that Dr. Lewis's testimony was not in conflict with Dr. Deering's but that her testimony also included her expert opinion regarding strangulation.

We conclude that trial counsel was not deficient in entering the agreed order to substitute Dr. Lewis for Dr. Deering. Trial counsel articulated that this decision was based on strategy, and strategic decisions made after a thorough investigation are virtually unchallengeable. *Kendrick*, 454 S.W.3d at 458. Accordingly, the Petitioner has not demonstrated deficiency and is not entitled to relief.

## IV. Photographs

### A. Photographs of the Victim and her Family

The Petitioner contends that trial counsel should have sought the exclusion of three family photographs of the victim which were admitted at trial. The State asserts that the Petitioner cannot demonstrate prejudice. Trial counsel testified that he did not object to the photographs because he believed they would be admitted regardless of any objection.

Prior to the Petitioner's trial, the Tennessee Supreme Court had "consistently cautioned the State against the introduction of such [portrait-style] photographs as evidence because they typically lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury." *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013) (citing *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006); *State v. Cole*, 155 S.W.3d 885, 912 (Tenn. 2005) (appendix)). *But see* T.C.A. § 40-38-103(c) (2015) (amended in 2015 to allow the admission of a photograph of the victim of a homicide "to show the general appearance and condition of the victim while alive").

However, we agree with the State that the Petitioner has made no showing of prejudice. The Petitioner was linked to the murder of the victim by his own statement to police and by strong physical evidence. There is not a reasonable probability that the jury would have acquitted him had trial counsel managed to exclude the three pictures of the victim with her family. *See State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013) ("Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial."); *Young*, 196 S.W.3d at 106 (holding that error admitting photograph was harmless); *Cole*, 155 S.W.3d at 912 (concluding that any error in admitting photograph was harmless). The photographs were not inflammatory or calculated to unduly rouse the jury's passions. The Petitioner is not entitled to relief.

## B. Photographs from the Autopsy

The Petitioner notes that trial counsel acknowledged that the autopsy photographs were graphic, and he asserts that trial counsel should have attempted to exclude them. The record reveals that the photographs were mainly close-up photographs of injuries sustained by the victim, including a photograph of the back of her left hand, her ear, her jaw, the side of her face, her forehead, and the back of her head. Trial counsel testified that the photographs were graphic but not gory. The State notes that the record contains only one autopsy photograph and that this photograph was in fact the subject of dispute at trial and was ultimately admitted in a black-and-white rather than color format.

Photographs of a victim's body are generally admissible if relevant to the issues at trial, notwithstanding the fact that they may be gruesome or horrifying. *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). "Post-mortem photographs can be helpful to show how the victim died and the nature of the injuries inflicted before death. Post-mortem pictures can also be relevant to the issue of deliberation or premeditation." *State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016), *cert. denied,* 138 S. Ct. 105 (2017). Autopsy photographs may be used to show "the brutality of the attack and the extent of force used against the victim." *State v. Robinson*, 146 S.W.3d 469, 492 (Tenn. 2004). Furthermore, "[t]o the extent the photographs tended to be shocking or gruesome, it [is] because the crime depicted was of that sort." *Davidson*, 509 S.W.3d at 200. Here, the Petitioner was charged with first degree premeditated murder, and photographs of the victim's corpse would have demonstrated the amount of trauma she suffered prior to her death, including that the Petitioner administered repeated blows. *See id.* at 199.

The State notes that the only autopsy photograph contained in the record is the photo of the victim's larynx, which trial counsel sought to exclude and succeeded in having admitted in black-and-white format. While we infer from the transcript that the other autopsy photographs were available at the post-conviction hearing, the photographs are absent from both the appellate record in this case and the appellate record of the Petitioner's direct appeal. The Petitioner bears the burden of providing a record adequate to support review of the issues raised. *State v. Bledsoe*, 226 S.W.3d 349, 357 (Tenn. 2007). The Petitioner makes a blanket statement that the autopsy photographs were graphic and prejudicial and that trial counsel should have sought to exclude them, but he presents no argument regarding which photographs in particular would not have been admissible or what the basis would have been to exclude them. We conclude that the Petitioner, having failed to append the photographs, specify which photographs were inadmissible, or specify what the grounds for excluding them would be, is not entitled to relief. *See* Tenn. R. App. P. 24(b); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (determining that the failure to prepare a proper record results in waiver).

- 13 -

## C. Crime Scene Photographs

The Petitioner asserts that trial counsel should have sought to exclude the crime scene photographs because they depicted the victim's corpse. Trial counsel testified that he did not move to exclude the photographs because he believed that they would be helpful to the defense. The post-conviction court credited trial counsel's testimony that he felt the photographs depicting the victim would support the Petitioner's theory of the case.

The Petitioner had given a statement acknowledging that he killed the 108-pound victim but asserting that he was attempting to defend himself against her pencil attack. The crime scene photographs showed the deceased victim lying with a pencil below the crook of her elbow, lending some credence to an otherwise implausible claim. Because the decision not to challenge the photographs was a sound strategic decision, the Petitioner cannot show that his counsel's actions were deficient. Furthermore, these photographs were relevant to the issues at trial, "because they accurately depict the nature and circumstances of the crimes." *State v. Carter*, 114 S.W.3d 895, 903 (Tenn. 2003) (concluding there was no error in admitting photographs of the deceased victims at the crime scene during capital sentencing); *see State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993) (finding no error in admission of photographs depicting deceased victims at the crime scene). Accordingly, the Petitioner has also not demonstrated prejudice.

## V. Failure to Obtain an Expert Witness

Finally, the Petitioner challenges trial counsel's failure to obtain a forensic pathologist to rebut Dr. Lewis's testimony by testifying that the victim's wounds were the result of mutual combat. At trial, Dr. Lewis testified that the victim was hit multiple times in the head with a blunt object, that she had two puncture wounds, and that she was ultimately strangled, resulting in her death. The victim had injuries on the back of her hands. Dr. Lewis testified that the victim's wounds appeared defensive but acknowledged on cross-examination that they could have been offensive.

When a petitioner seeks post-conviction relief by asserting that trial counsel failed to present a witness, that witness should be presented at the post-conviction hearing. *Pylant*, 263 S.W.3d at 869. Because the post-conviction court cannot speculate as to the testimony of the missing witness, testimony from the witness may be necessary to demonstrate that critical evidence was omitted from trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Although the Petitioner asserts that a hypothetical forensic pathologist could have given more favorable testimony which might have supported his theory of self-defense, the Petitioner has failed to present the testimony of such an expert at the post-conviction hearing. *See Thomas Cothran v. State*, No. M2008-

01071-CCA-R3-PC, 2009 WL 4438542, at *8 (Tenn. Crim. App. Dec. 3, 2009) (concluding that the petitioner could not establish prejudice on claim that trial counsel failed to obtain an expert without presenting the expert). Accordingly, the Petitioner cannot demonstrate prejudice.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE